**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| HYDRAFACIAL LLC,<br><br>Plaintiff,<br><br>v.<br><br>AESTHETIC MANAGEMENT PARTNERS, LLC and AESTHETIC MANAGEMENT PARTNERS INC.,<br><br>Defendants. | ) | Case No. 2:24-cv-02480-SHL-tmp |

**ORDER DENYING PLAINTIFF HYDRAFACIAL, LLC'S MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiff HydraFacial LLC's ("HydraFacial") Motion for a Preliminary Injunction, filed June 13, 2025. (ECF No. 42.) Defendants Aesthetic Management Partners, LLC and Aesthetic Management Partners, Inc. ("AMP") responded on July 11, 2025. (ECF No. 69.) The Court held a hearing on the Motion on July 25, 2025. (ECF No. 77.)[1] At the hearing, Karl Leinsing and Vipul Savsani testified on behalf of HydraFacial. Dr. Alexander Slocum testified on behalf of AMP.[2]

[1] AMP filed a notice on October 1, 2025, in which it explained that the Nevada District Court denied a preliminary injunction in Hydrafacial LLC v. Medicreations LLC, Case No. 2:24-cv00855-MMD-DJA, a case which AMP contends presented several parallels to this matter. (ECF No. 119.) After AMP filed the Nevada court's order denying the preliminary injunction (ECF No. 121-1), HydraFacial filed a response arguing that the Medicreations case was distinguishable from this one, mainly because HydraFacial's pre-suit conduct in this case "does not exhibit any of the alleged pre-suit delay found in the Medicreations matter" (ECF No. 126 at PageID 5561).

[2] Based on positions the Parties took at the preliminary injunction hearing, the Court asked for additional briefing as to whether Dr. Slocum's testimony exceeded the scope of permissible expert testimony. (See ECF Nos. 84, 92.) AMP concedes HydraFacial's argument that "claim construction ultimately is a question of law for the Court," but argues that "courts

For the reasons stated below, the Motion is **DENIED**.

## BACKGROUND[3]

This case involves allegations that AMP is infringing on several of HydraFacial's patents that are used in HydraFacial's skin resurfacing and rejuvenation systems.[4] Those systems, which include the HydraFacial Syndeo, the HydraFacial Tower, the HydraFacial Allegro, and the HydraFacial Elite, "clean and exfoliate the skin's surface, extracting debris from pores, and nourishing the skin with therapeutic moisturizing solution." (ECF No. 42-1 at PageID 489.) HydraFacial alleges that AMP's AquaFirme XS system is a copycat of those HydraFacial systems, and that the "AquaFirmeXS system infringes at least Claim 1 of the '052 Patent and Claim 22 of the '287 Patent." (Id. at PageID 492 (collectively the "PI Claims").)

Claim 1 of the '052 Patent recites as follows:

> 1. A system for performing a skin treatment procedure, the system comprising:
> a console including a manifold, the manifold being in fluid communication with a first fluid container and at least a second fluid container, the first fluid container and the at least the second fluid container being configured to contain a treatment material for a skin treatment procedure, wherein the treatment material comprises a liquid;
> a handpiece assembly comprising a tip, the tip being configured to contact a skin surface of a subject;
> a supply conduit placing the manifold of the console in fluid communication with the handpiece assembly, wherein a distal end of the supply conduit is configured to couple to the handpiece assembly;
> wherein the manifold is configured to control a flow of treatment material from the first

---

arrive at a proper claim construction after considering all available evidence," which may include expert testimony "to explain how an invention works, [and] to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art." (ECF No. 92 at PageID 4411 (quoting Phillips v. AWH Corp., 415 F.3d 1303, 1318 (Fed. Cir. 2005).) Because the cases AMP relies on do not counsel otherwise, the Court will consider Dr. Slocum's testimony.

[3] In reaching its factual findings, the Court relies on the testimony offered at the July 25 hearing and on the portions of the record that are undisputed.

[4] The patents at issue are Patent Nos. 9,550,052 ("the '052 Patent"); 11,446,477; 11,865,287 ("the '287 Patent"); 10,357,641; and 10,357,642 (collectively the "Asserted Patents").

fluid container and at least the second fluid container through the supply conduit; and a vacuum source;

a waste conduit in fluid communication with the tip of the handpiece assembly to remove waste away from a skin surface of a subject during a skin treatment procedure, wherein the waste conduit is operatively coupled to the vacuum source; and

wherein the system is configured to permit a user to select the treatment material from the first fluid container or the at least second fluid container to be delivered through the supply conduit to the handpiece assembly; and

wherein, when the vacuum source is activated and the tip contacts the skin surface, a suction force is created within the waste conduit and along the tip, thereby removing waste from the skin surface via the waste conduit while drawing treatment material from the first fluid container or the second fluid container to the tip via the supply conduit.

(ECF Nos. 1-4 at PageID 99; 42-3 at PageID 577.)

Claim 22 of the '287 Patent recites as follows:

22. A system for treating skin, the system comprising:

a console configured to receive a first container and at least one additional container;

a collection lumen configured to be in fluid communication with the first container and the at least one additional container when the first container and the at least one additional container are connected to the console; and

a handpiece having a working end, the working end of the handpiece being configured to contact skin tissue of a subject during use;

wherein the working end of the handpiece is configured to be placed in fluid communication with a vacuum source to create a suction force along a distal end of the handpiece when the vacuum source is activated and the handpiece is connected to the console and wherein the working end of the handpiece is configured to be placed in fluid communication with the first container or the at least one additional container through the collection lumen; and

a supply conduit that places the collection lumen in fluid communication with the working end of the handpiece when the handpiece is connected to the console;

wherein each of the first container and the at least one additional container includes treatment materials, and wherein treatment materials from the first container and the at least one additional container are configured to be delivered to the supply conduit sequentially when the first container and the at least one additional container are connected to the console.

(ECF Nos. 1-6 at PageID 192; 42-3 at PageID 581.)

## LEGAL STANDARD

"A preliminary injunctions is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" Starbucks Corp. v. McKinney, 602 U.S. 339, 345–46 (2024) (quoting Winter v.

Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)). The familiar standard for evaluating whether such extraordinary relief should be issued "requires a plaintiff to make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" Id., at 345. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24; McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012) ("[T]he four considerations applicable to preliminary injunctions are factors to be balanced and not prerequisites that must be satisfied.")

Ultimately, the preliminary injunction factors "simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." McNeilly, 984 F.3d at 615 (quoting Am. Imaging Servs., Inc. v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.), 963 F.2d 855, 859 (6th Cir. 1992)). "The party seeking the preliminary injunction bears the burden of justifying such relief, including showing irreparable harm and likelihood of success." McNeilly, 984 F.3d at 615 (citing Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 441 (1974)). "[A] movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm." PHG Techs., LLC v. St. John Companies, Inc., 469 F.3d 1361, 1365 (Fed. Cir. 2006).

## ANALYSIS

According to HydraFacial, each of the limitations of the PI Claims is present in the AquaFirme XS system and, because AMP also cannot establish that the patents are invalid, HydraFacial is likely to prevail on the merits of its claim, satisfying the first preliminary injunction prong. (ECF No. 42-1 at PageID 501–04.) HydraFacial also asserts that it is likely to

suffer irreparable harm absent an injunction, as the AquaFirme XS system directly competes with HydraFacial's systems, will damage HydraFacial's reputation, and will cause it to lose customers. (Id. at PageID 504–07.) As to the third factor, HydraFacial argues that the balance of hardships also favors granting a preliminary injunction, as the sales of HydraFacial's systems is critical to its economic success, and that importance "far outweighs Defendants' interest in continuing to infringe on HydraFacial's patents." (Id. at PageID 507.) Finally, HydraFacial asserts that the public interest favors an injunction, as the public is best served by enforcing valid patents, and the issuance of an injunction will not harm the public because HydraFacial can meet the market demand for the cosmetic device systems. (Id. at PageID 508.)

AMP counters that HydraFacial has failed to carry its burden to establish it is entitled to a preliminary injunction under any of the four factors. First, it asserts that HydraFacial fails to establish that it is likely to succeed on the merits of its infringement claims, as HydraFacial is unlikely to prove that the AquaFirme XS infringes Claim 1 of the '052 Patent or Claim 22 of the '287 Patent, and also because there are substantial questions as to the validity of the patents. (ECF No. 70 at PageID 4053–59.) AMP also contends that HydraFacial fails to show that it would suffer irreparable harm absent an injunction for multiple reasons, including that it unreasonably delayed seeking the injunction; it previously sought and was granted a stay in this case; it failed to seek injunctive relief against numerous other purported infringers; the patents were set to expire within months of the HydraFacial seeking injunctive relief; and because HydraFacial's harm is speculative and, in any event, even if infringement is found and harm is proven, HydraFacial could be compensated with money damages. (Id. at PageID 4060–66.) AMP asserts that the remaining factors do not justify a preliminary injunction, as the balance of hardships do not favor HydraFacial given that any hardship would be short-lived, because

HydraFacial is a much large company than AMP, and because AMP's AquaFirme XS system includes features and functions that HydraFacial does not allege are infringing. (Id. at PageID 4067–68.) Finally, AMP argues that the public interest disfavors a preliminary injunction because a competitive market in skin restoration devices benefits the public, especially considering the additional uses of the AquaFirme XS that HydraFacial does not allege infringe on its patents. (Id. at PageID 4068.)

As explained below, each of the factors weighs in AMP's favor. Although HydraFacial's failure to demonstrate that it is likely to succeed on the merits renders an evaluation of the remaining factors unnecessary, all factors are addressed.

I. Likelihood of Success on the Merits

"Because substantive matters of patent infringement are unique to patent law, the estimated likelihood of success in establishing infringement is governed by Federal Circuit law." Anderson v. TOL, Inc., 927 F. Supp. 2d 475, 486 (M.D. Tenn. 2013) (citing Revision Military, Inc. v. Balboa Mfg. Co., 700 F.3d 524, 526 (Fed. Cir. 2012)). Under the applicable standard, the patentee must establish that it is "more likely than not" the defendant is infringing on one of the patent claims. Revision Military, 700 F.3d at 526. "If the accused infringer 'raises a substantial question concerning either infringement or validity,' then the patentee has not established that it is likely to succeed on the merits, and a preliminary injunction is not appropriate." LifeScan Scotland, Ltd. v. Shasta Techs., LLC, 734 F.3d 1361, 1366 (Fed. Cir. 2013) (citations omitted). At the preliminary injunction stage, "a showing of a substantial question of invalidity requires less proof than the clear and convincing standard to show actual invalidity" of a patent. Erico Int'l Corp. v. Vutec Corp., 516 F.3d 1350, 1356 (Fed. Cir. 2008)

Here, HydraFacial has failed to show that it is "more likely than not" that AMP is infringing on either '052 Claim 1 or '287 Claim 22, warranting denial of its Motion. HydraFacial asserts that Leinsing's Declaration, elements of which he reiterated at the hearing, provides detailed charts that show how the AquaFirme XS infringes on the PI Claims, and that each of the limitations from the '052 and '287 Patents are present in the AquaFirme XS system, establishing a likelihood of a demonstration of infringement. (ECF No. 42-1 at PageID 501.) However, HydraFacial's arguments, and the support offered through its expert's declaration and testimony, fail to demonstrate that it is entitled to the extraordinary relief it seeks.

Dr. Slocum's testimony at the hearing and his declaration (ECF No. 69-17) raise a substantial question as to whether the AquaFirme XS infringes either patent. Beginning with '052, Dr. Slocum argues that the AquaFirme XS does not infringe on Claim 1, particularly when it comes to the role the manifold plays in that Claim. As Dr. Slocum's declaration explained, to the extent there can be considered a manifold in the AquaFirme XS, the tubes and connectors that would qualify "do not satisfy a key requirement of the 'manifold' in claim 1 of the '052 patent," namely that they are always open and thus are unable to control flow of serums. (Id. at PageID 3027.)

At the hearing, Leinsing embraced Dr. Slocum's characterization of what might constitute a manifold in the AquaFirme XS, and testified simply that he "agree[s] it's a manifold and its found in the AMP device; therefore it would infringe . . . the 052 Patent, Claim 1." (ECF No. 82 at PageID 4255.) Leinsing's conclusion overstates Dr. Slocum's description of the presence of the manifold in the AquaFirme XS, and, more importantly, disregards the nuance of Dr. Slocum's ultimate conclusion that any such manifold cannot control the flow of serums, one

of the limitations outlined in Claim 1. Accordingly, HydraFacial has not shown that it is more likely than not that the AquaFirme XS infringes on Claim 1 of the '052 patent.

The analysis is similar for Claim 22 of the '287 Patent. The expert declarations and the testimony at the hearing focused on the term "fluid communication" found in Claim 22. Leinsing explained at the hearing that fluid communication is a term of art, and that the AquaFirme XS satisfied the limitation of the '287 Patent because there was fluid communication between its vacuum source and its handpiece. (ECF No. 82 at PageID 4256.) Leinsing asserts that the AquaFirme XS's "working end of the handpiece is configured to be in fluid communication with the vacuum source to create a suction force along the distal end of the handpiece," and his declaration provides images of the device to illustrate the point. (ECF No. 42-3 at PageID 563–64.)

Dr. Slocum's analysis tells a different story. He asserts that "the AquaFirme XS does not infringe claim 22 of the '287 patent since it does not satisfy the following requirement of the claim: 'wherein the working end of the handpiece is configured to be placed in fluid communication with a vacuum source . . .'" (ECF No. 69-17 at PageID 3029.) He explains that, in the AquaFirme XS, "the treatment material is a liquid," therefore for it "to satisfy this claim limitation, the working end of the handpiece must be in liquid communication with the vacuum source." (Id. at PageID 3028.) Ultimately, Dr. Slocum testified that because "[t]here is no direct hose leading from the handpiece to the vacuum pump," and "[t]he vacuum pump doesn't even know there's a handpiece there," the AquaFirme XS does not meet the requirement of Claim 22 of the '287 Patent. (ECF No. 82 at PageID 4329.)

It may be true, as Leinsing testified, that "[f]luid communication is basically talking about the plumbing between the structures, that they're fluidically connected" and therefore

"fluid communication" can refer to "air or liquid or anything." (Id. at PageID 4256–57.) That does not change, however, Dr. Slocum's description of how the AquaFirme XS operates, which is to say that that it contains a "vacuum pump [that] provides an air vacuum to a waste container to which a line is separately connected that leads to the handpiece." (ECF No. 69-17 at PageID 3029.) In other words, even taking Leinsing's term of art description of "fluid communication," the lack of a handpiece leading directly to the vacuum pump in the AquaFirme XS renders—at the very least—a substantial question concerning whether there is any communication between the vacuum source and the handpiece in the AquaFirme XS, which means that HydraFacial has failed to establish that it is more likely than not that AMP has infringed on Claim 1 of the '052 Patent.

Because HydraFacial has failed to show that it is more likely than not that the AquaFirme XS infringes '052 or '287, at this stage of the proceedings the Court need not address the thornier question as to whether there is a substantial question as to whether HydraFacial's patents are valid and whether, as HydraFacial anticipatorily argued in its Motion, AMP's "invalidity arguments are meritless and clearly rely on deficient prior art references and hindsight." (ECF No. 42-1 at PageID 502.) The Court will conduct that analysis if and when it becomes necessary.

II. Irreparable Harm

HydraFacial asserts that it will be irreparably harmed if it is forced to compete with AMP, arguing that "competition between the patentee and the infringer, particularly direct competition, strongly militates toward a finding of irreparable harm." (ECF No. 42-1 at PageID 504 (quoting Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 653 (Fed. Cir. 2015) (concurrence).) HydraFacial argues that, not only will it be irreparably harmed if it is forced to

compete with AMP, but its reputation will also be damaged based on its innovations appearing in a competitors' devices, and it will also lose customers. (Id. at PageID 505.)

AMP asserts that HydraFacial fails to demonstrate irreparable harm for multiple reasons. First, there was a substantial delay between when HydraFacial learned of the alleged infringement—which AMP asserts was likely soon after it started selling the product in February 2022 but, at the very latest by October 10, 2023, when HydraFacial sent AMP a threat letter—and when it sought the injunction on June 13, 2025. (ECF No. 70 at PageID 4060.) AMP further argues that any claim that HydraFacial is suffering from irreparable harm is also undermined by the fact that the Parties jointly moved for, and were granted, a stay in the case in September 2024. (See ECF Nos. 19, 21.) AMP also suggests that there is no irreparable harm because HydraFacial has alleged infringement of the '287 and '052 patents in many other cases over the years, but failed to seek injunctive relief against those alleged infringers. (ECF No. 70 at PageID 4062.) Finally, AMP asserts that the fact that the patents were set to expire within one year of the filing of the motion for preliminary injunction, along with the fact that HydraFacial's harms are either purely speculative or compensable with monetary damages undermines the claim that the damages are irreparable.

As AMP asserts, HydraFacial's claims of irreparable harm are undermined by its delay in seeking the permanent injunction. "[D]elay in bringing an infringement action and seeking a preliminary injunction are factors that could suggest that the patentee is not irreparably harmed by the infringement." Apple, Inc. v. Samsung Elecs. Co., 678 F.3d 1314, 1325 (Fed. Cir. 2012). Not all of the delays that AMP cites could have been avoided by HydraFacial. For instance, as HydraFacial points out, "[t]he parties moved to stay this case on September 9, 2024, just two months after the filing of the complaint," and the "stay was statutory and mandatory." (ECF No.

126 at PageID 5562 (citations omitted).) Nevertheless, AMP's alleged infringement began in February 2022, nearly two-and-a-half years before HydraFacial filed its lawsuit. Although HydraFacial asserts that it engaged in good faith negotiations and mediation with AMP between October 2023 and when it filed its complaint in July 2024, there are months on either side of that window when HydraFacial could have filed a motion for preliminary injunction—including upon the filing of the lawsuit and before the matter was stayed—and did not. HydraFacial cannot assert that its reputation would be damaged because its dealers and distributors rely on its "commitment to enforcing its intellectual property rights," while at the same time fail to zealously commit to enforcing those intellectual property rights. (ECF No. 42-1 at PageID 505 (citation and quotation marks omitted).)

AMP's argument that HydraFacial's failure to seek preliminary injunctive relief against all parties that may have infringed on its patents demonstrates that AMP's alleged infringement is not causing irreparable harm is less persuasive. HydraFacial is free to adopt a litigation strategy that varies from case to case, and may determine that certain alleged infringements necessitate different approaches than others. At the same time, however, the fact that HydraFacial's patents were set to expire less than a year from the date of the filing of its Motion makes that harm less than irreparable. To the extent there is harm, it would be of a finite nature.

In any event, the harm would also be compensable with money damages. The Court does not doubt, as HydraFacial asserts, the products that it and AMP are selling are the sort that "foster[] significant reliance." (ECF No. 42-1 at PageID 506 (citing Natera, Inc. v. NeoGenomics Lab'ys, Inc., 106 F.4th 1369, 1379 (Fed. Cir. 2024).) And, as HydraFacial asserts, courts have found that harm can be irreparable under such circumstances. But given the small time window of alleged infringement and that the damages, both present and ongoing,

would be calculable with some level of precision based on the AquaFirme XS unit sales and the ongoing revenues those units can be expected to generate, the harm would not be irreparable in this instance.

Given the foregoing, even if HydraFacial ultimately successfully demonstrates that AMP has infringed on its patents, the sort of harm it will have suffered as a result of those infringements will not be irreparable. This factor also weighs against granting a preliminary injunction.

III. Balance of Equities

HydraFacial argues that, "[w]here a valid patent has been infringed, the balance typically favors the patent owner." (ECF No. 42-1 at PageID 507.) It further argues that its systems are critical to its economic success, and those interests outweigh any interest AMP has in continuing to infringe on HydraFacial's patents. (Id.)

HydraFacial's arguments, of course, presume that HydraFacial's use infringes on the patents. Although that might ultimately be the case, for the purpose of ruling on the motion for preliminary injunction, the Court has determined that HydraFacial has failed to demonstrate that it is likely to succeed on the merits of its claim. Accordingly, this factor also weighs against granting injunctive relief.

IV. The Public Interest

HydraFacial argues that AMP cannot overcome the presumption that "the public interest is best served by enforcing patents that are likely valid and infringed," as "Defendants have no defensible interest in selling their infringing products." (ECF No. 42-1 at PageID 508 (citations omitted).) Therefore, they argue that the public interest therefore favors an injunction.

AMP asserts that HydraFacial's request for injunctive relief "until this matter can be tried," is an attempt at patent misuse, and is therefore not in the public interest, as any such relief would extend beyond the expiration of the patents. AMP asserts that the public interest weighs against allowing HydraFacial to use invalid patents to prevent legitimate competition, and the public is better served by a "competitive market in skin restoration devices, particularly where AMP's system has indisputably non-infringing uses, e.g., hair replacement treatments." (ECF No. 70 at PageID 4068.)

Once again, although HydraFacial offers an accurate recitation of the law, its argument that the public interest tilts in its favor is based on the presumption that the patents at issue here are likely valid and that AMP infringed upon them. Once again, the Court has determined that, at least at this stage in the proceedings, HydraFacial has not demonstrated that it is more likely than not to prevail on its claims of infringement. Because it has not, the public interest does not weigh in its favor.

## CONCLUSION

For the foregoing reasons, HydraFacial's Motion for Preliminary Injunction is **DENIED**.

**IT IS SO ORDERED,** this 9th day of September, 2026.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE